# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 7, 2001

## STATE OF TENNESSEE v. ANTONIO DEWAYNE CARPENTER

**Appeal from the Circuit Court for Fayette County**
**No. 4790      Jon Kerry Blackwood, Judge**

---

### No. W2001-00580-CCA-R3-CD  - Filed February 12, 2002

---

The defendant, Antonio Dewayne Carpenter, was indicted for premeditated murder, felony murder, especially aggravated kidnapping, and especially aggravated robbery. The state filed notice seeking the death penalty. The defendant was convicted on each count of the indictment and the trial court merged the felony murder conviction with the premeditated murder conviction. At the conclusion of the penalty phase of the trial, the jury imposed a sentence of life without the possibility of parole. The trial court ordered concurrent twenty-year sentences for especially aggravated kidnapping and especially aggravated robbery. All of these sentences were ordered to be served consecutively to three life sentences for federal convictions stemming from the same incident.[1] In this appeal of right, the defendant challenges the sufficiency of the evidence and argues that the dual sovereignty doctrine, which permits successive federal and state prosecutions for the same acts, should be abandoned. The judgments are affirmed.

### Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Marty McAfee, Memphis, Tennessee (at trial and on appeal), and James A. Simmons, Nashville, Tennessee (at trial), for the appellant, Antonio Dewayne Carpenter.

Paul G. Summers, Attorney General & Reporter; Kim R. Helper, Assistant Attorney General; and Elizabeth T. Rice, District Attorney General, for the appellee, State of Tennessee.

---

[1] In the U.S. District Court for the Western District of Tennessee, Docket No. 99-20155, the defendant pled guilty to carjacking with the intent to cause death and serious bodily harm, use of a firearm during the commission of a carjacking, and killing to prevent the victim's communication with law enforcement about the carjacking, i.e., killing a federal witness or potential federal witness.

# OPINION

On June 15, 1999, the defendant and Eric Glover were at the residence of the defendant's aunt on Sycamore Street in Collierville working on the defendant's car.[2] According to a transcript of Glover's testimony at his own trial, the defendant's brother, Robert Carpenter, arrived that morning and planned to help them repair the vehicle. Glover claimed in the prior proceeding that he asked Robert Carpenter for a ride to the Sonic Restaurant. Glover explained that he intended to ask for free food from a friend named Lamont Nunley, whom he knew as Mont, who worked at the Sonic. Because the manager was at the restaurant when they arrived, Glover and Robert Carpenter were asked to come back later. Glover claimed that he and Robert Carpenter then returned to the Sycamore Street residence, where the defendant was working on his car, before returning to the Sonic. According to Glover, Mont instructed them to park at a nearby NAPA Auto Parts store, wait five minutes, and return. Glover stated that when he and Robert Carpenter returned to the Sonic later, they received some food.

Earlier that morning, the victim, Barbara Ann Lee, had prepared for a New Mexico vacation with her husband, Robert Lee. The victim was accompanied by her dog, Otis, as she drove her 1997 green Chevrolet Blazer to the First Tennessee Bank where she withdrew $200.00 in $20.00 bills. After finishing her business at the bank, the victim drove to the Sonic Restaurant to order some lunch. When the victim arrived at the Sonic she was recognized by a carhop, Sheran Diane Bryson. Ms. Bryson stated that the victim was a frequent customer at the Sonic. As Ms. Bryson carried an order to the victim, she noticed a black male inside her car. She also saw a second black male, who wore a light blue windsuit, standing on the driver's side of the victim's vehicle holding a long black gun. Ms. Bryson returned to the restaurant, called 911, and hid on the floor. By the time the police arrived, the victim, her vehicle, and the two black males were gone.

Joshua Smith, who was working on his car outside the NAPA store next door to the Sonic, saw three black males in a blue Buick parked at the NAPA store just prior to the kidnapping. Smith's account contradicted Glover's statement at his trial that only he and Robert Carpenter went to the NAPA store. Smith testified that he recalled that the driver got out of the car, asked him about the location of a restroom, and went inside the store. Smith observed them leave about five minutes after the driver returned from inside the store. After they left, Smith went inside the store for about five minutes. When he returned to his vehicle, he saw that the Buick was again parked in the NAPA lot but in a different location. Within 15 minutes, the Collierville police arrived.

Detective Scott Young was dispatched to the Sonic Restaurant. While investigating the scene, he discovered a four-door Buick at the NAPA store registered in the name of Robert

---

[2]Eric Glover was convicted of first degree murder and sentenced to life imprisonment. He was ineligible for the death penalty because he was less than 16 years of age at the time of the offense. Robert Carpenter was convicted of first degree murder in a bench trial and sentenced to life without the possibility of parole. He was ineligible for the death penalty because of his mental retardation. Glover exercised his Fifth Amendment right and refused to testify at the defendant's trial.

Carpenter, Jr. A search of the vehicle yielded a McDonald's paycheck stub payable to the defendant.

Investigator Don Pugh of the Fayette County Sheriff's Department, drove to Robert Carpenter's residence on Yager Road at approximately 2:00 P.M. Three young black males informed him that they had not seen Robert Carpenter. After traveling to Moscow in search of Robert Carpenter and the green Blazer owned by the victim, Officer Pugh returned to the suspect's residence on Yager Road. At that point, he saw a green Blazer being driven out of the driveway and recognized Robert Carpenter as the driver. There were two others inside the vehicle. Officer Pugh followed the vehicle as it was driven south into Mississippi. Because he believed that the victim may have been one of the occupants, Officer Pugh backed off from the chase but notified law enforcement in Marshall County, Mississippi. Officer Pugh continued to follow when the Blazer was turned onto a gravel road and driven to a dead end in a field. The three occupants fled. Shortly after they fled, the defendant and Glover were taken into custody. Robert Carpenter, Jr., however, escaped. Collierville Detective Gannon Hill was present when the defendant and Glover were arrested. He provided <u>Miranda</u> warnings to the defendant, who initially denied any knowledge of the victim's whereabouts. According to Officer Hill, the defendant later admitted that the victim was dead and that her body had been disposed of behind the Yager Road residence.

Major Randy Harper of the Marshall County Sheriff's Department searched the defendant after his arrest. He found $306.00 in cash in the defendant's pocket. The defendant provided directions to the murder weapon to Officer Ricky Wilson of the Fayette County Sheriff's Department. Officer Wilson found a sawed-off .22 semi-automatic weapon, which contained no fingerprints, approximately fifty feet from the victim's body. On the day before the murder, Janette Marshall saw the defendant carrying a sawed-off rifle with a wooden handle. According to Marshall, she saw the defendant remove the weapon from his car and place it in the trunk of Mont's car.

Police discovered the victim's dog approximately 9/10 of a mile from the Carpenter residence. The victim's body, which had been covered with blankets and brush, was discovered in a nearby ditch. Her purse contained no money but did include a receipt from the Eddie Bauer clothing store. Eddie Bauer clothing tags were also found on the ground near the ditch. Robert Carpenter, who was later found and arrested, and Glover were wearing Eddie Bauer clothing at the time of their arrests.

According to the prior testimony provided by Glover, Robert Carpenter confronted the victim with the weapon at the Sonic, moved her into the passenger seat of her Blazer, and instructed Glover to move the Buick to the NAPA lot. Glover claimed that they drove to the Sycamore Street residence where the defendant joined them and the three men then drove to the Yager Road residence where they learned that police were looking for them. He stated that Robert Carpenter searched the victim's purse but that he and the defendant refused to assist, asking Robert Carpenter not to harm her. According to Glover, Robert Carpenter told the victim that she was being released and then struck her in the back of the head with his rifle as she walked away. Glover believed that she died instantly. Glover and Robert Carpenter changed into the Eddie Bauer clothing in an effort to disguise their appearances.

According to Glover, when the three got back into the Blazer, Robert Carpenter drove to the location of the body and ran over the victim. Glover claimed that he and the defendant were surprised when Robert Carpenter ran over the victim. He estimated that Robert Carpenter drove over the victim four times. At that point, Glover and the defendant moved the victim to the ditch and covered her body with a seat cover found inside the Blazer. They threw away the gun and the victim's purse and cell phone. The victim's checkbook and credit cards were left near the ditch.

In a statement to Marshall County officers, the defendant denied participation in the carjacking, explaining that he was working on his car while Glover and Robert Carpenter went to the Sonic Restaurant. He stated that he joined the two other men at 1:00 P.M. when they returned to the Sycamore Street residence driving a Blazer. The victim and her dog were in the automobile. The defendant claimed that he attempted to persuade Robert Carpenter "to let the lady go." Like Glover, he stated that they then drove to the Yager Road residence where they learned that the police had been there looking for Robert Carpenter. The defendant claimed that Robert Carpenter agreed to release the victim, but then swung the rifle at her, striking her in the side of the head. The defendant told officers that the victim fell to the ground, bleeding from the head. According to the defendant, Robert Carpenter then returned to the location of the victim and ran over her with her car. He claimed that Robert Carpenter was driving 40 to 50 miles per hour when he drove over the victim. The three men then hid the body and threw away the gun. The defendant admitted that he was in the back seat of the Blazer when police began their pursuit. He fled and was discovered hiding in the weeds.

Dr. O.C. Smith, Shelby County Medical Examiner, conducted the autopsy. He testified that the victim suffered blunt trauma to the head and blows to the face. Dr. Smith counted two injuries to the head which he described as being consistent with blows inflicted by the weapon found at the scene. He also described a neck injury that crushed the victim's windpipe which he did not believe to be caused by the car. He discovered injuries to the chest and left shoulder that he described as inconsistent with being caused by a motor vehicle. Dr. Smith found 38 separate fractures in the rib cage, a crushed chest, and a ruptured liver. The abdomen and pelvis were also crushed, consistent with being struck by a slow moving vehicle.

Dr. Lee Roy Reddick, an Alabama State Medical Examiner, testified that all of the crushing injuries to the victim were consistent with having been run over by a heavy vehicle. Dr. Reddick opined that it was highly probable that the crushing injury to the victim's neck was caused by the vehicle. It was his view that the barrel of the rifle could have inflicted the injury only if it had been moved with "an incredible amount of velocity." Dr. Reddick concluded that the rifle barrel could not have caused the crushing injury to the neck.

The state also introduced portions of the defendant's guilty pleas to the following offenses: Carjacking with the intent to cause death and serious bodily harm, use of a firearm during the commission of a carjacking, and killing to prevent the victim's communication with law enforcement about the carjacking.

-4-

During the penalty phase of the trial, Dr. Smith testified that the victim was alive when she was struck in the head, when her larynx was crushed, and when she sustained the crushing injuries to her ribs, pelvis, abdomen, and chest. It was his opinion that the injuries qualified as torture.

Dr. Pamela Auble, who testified for the defendant, described him as one of 15 children born to an unwed mother by five different fathers. She stated that he grew up in poverty, had no bathroom facilities, and had only one space heater as a source of heat. Dr. Auble testified that the defendant was exposed to explicit sexual behavior and that his four older brothers had to be removed from the home following physical abuse by their parents. Several of the family members experienced alcohol and drug abuse problems. She stated that the defendant had a history of depression and anxiety, including suicide attempts. She stated that his IQ was 67. Dr. Auble described the defendant as immature and easily influenced by others.

Lester Paine, a minister, testified that he had attempted to assist the Carpenter children. He stated that they were neglected and that the defendant had expressed remorse since the murder.

The jury determined that the state had proved three aggravating circumstances: (1) that the killing was heinous, atrocious and cruel; (2) that the killing was done to avoid capture and/or prosecution; and (3) that the killing occurred either during the commission of the offense or in a later flight.

I

The defendant first argues that the evidence was insufficient to support any of the three convictions. He argues that the proof offered by the state, even in its most favorable light, established nothing more than facilitation of the offenses. The defendant submits that the evidence on each of the three crimes falls within Tennessee Code Annotated section 39-11-403, which provides as follows:

> (a) A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony;
> (b) The facilitation of the commission of a felony is an offense of the class next below the felony facilitated by the person so charged.

Tenn. Code Ann. § 39-11-403. In response, the state argues that the evidence supports the jury's conclusion that the defendant was criminally responsible for each of the three offenses.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is

challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Tennessee Code Annotated section 39-11-401(a) provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tennessee Code Annotated section 39-11-402 provides, in pertinent part, as follows:

> A person is criminally responsible for an offense committed by the conduct of another if:
> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense; [or]
> (2) Acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or result of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense;

Tenn. Code Ann. § 39-11-402(1)-(2).

The defendant argues that several facts support mere facilitation of each of the three crimes charged, not criminal responsibility. Sheran Bryson, the Sonic carhop, testified that she saw two black males, neither of whom she could identify, at the victim's car. She informed police that one of the perpetrators wore light blue clothing. Robert Carpenter, whose Buick was found at the NAPA Auto Parts store next door to the Sonic, was wearing a light blue windsuit. In the statement to police, the defendant contended that he was at the Sycamore Street residence at the time of the robbery and abduction and became unwittingly involved when his brother, Robert Carpenter, invited him into the victim's Blazer to ride to the Yager Road residence. Eric Glover provided essentially the same account at his own trial. Further, only Glover and Robert Carpenter changed into the Eddie Bauer clothing, explaining that only they had been seen by witnesses. Both Glover and the defendant told police that they attempted to convince Robert Carpenter to allow the victim to go unharmed. Each claimed that they urged Robert Carpenter not to drive over the victim with the Blazer.

While the jury was properly instructed on criminal responsibility for facilitation of a felony, there was other proof from which the jury could have appropriately inferred the greater offenses. Before his trial, the defendant entered guilty pleas in federal court to killing a federal witness to prevent communication with law enforcement. Prior to the entry of the plea, the defendant agreed

that the proof would have established that the victim was killed in order to prevent her from providing information regarding the carjacking to federal officers. Moreover, the defendant acknowledged in federal court that at the time of the carjacking, he possessed the intent to cause death or serious bodily injury. Before the acceptance of the plea, the defendant was asked to acknowledge that "at the time [he] took the car, that Blazer, [he had] already formed the intent to cause death or serious bodily injury. . . ." Further, the fact that Joshua Smith had observed three black males in the car located near the crime scene before the kidnapping was particularly compelling circumstantial evidence. Dr. Smith testified that the crushing injury to the victim's neck and serious injuries to her chest and shoulder were not caused by the Blazer, a finding which was inconsistent with the assertions made by Glover and the defendant in their statements to police. The jury could have properly inferred from this inconsistency that neither the defendant, who initially lied to the police about the location of the body, nor Glover had been entirely truthful in providing an account of the crime. That the defendant recalled the specific location of the weapon, assisted in hiding the body of the victim, and took possession of her cash lent credence to the state's theory that the defendant had provided substantial assistance in the commission of the offenses.

Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder to include the premeditated and intentional killing of another. Premeditation must be formed prior to the murder. Tenn. Code Ann. § 39-13-202(d). Felony murder is the killing of another in the perpetration of or attempt to perpetrate, among other crimes, a robbery. Tenn. Code Ann. § 39-13-202(a)(2). Robbery is defined as the intentional or knowing theft of property from a person by the use of violence or the placement of that person in fear. Tenn. Code Ann. § 39-13-401.

Here, a witness saw the defendant, the day before the robbery, place a gun that looked like the weapon used in the robbery in the trunk of a vehicle owned by Mont, the Sonic Restaurant employee. Joshua Smith identified the vehicle of Robert Carpenter and placed Robert Carpenter and two other black males near the scene of the crime immediately before the abduction of the victim. As indicated, Smith observed the three men, not two, who were parked in close proximity to where he was working on his vehicle, for well over 15 minutes. The defendant had $306.00, which had been taken from the victim, in his pocket when he was arrested. The jury accredited the witnesses for the state and, as was its prerogative, inferred from the circumstantial evidence that the defendant had assisted in the abduction of the victim and was fully involved in the robbery. In our view, the evidence was sufficient for both premeditated murder and felony murder.

Especially aggravated kidnapping is defined as a false imprisonment "[a]ccomplished with a deadly weapon or by a display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1). False imprisonment is defined as the "knowing removal or confinement of another so as to substantially interfere with the other's liberty." Tenn. Code Ann. § 39-13-302(a). The defendant's guilty pleas in federal court, the circumstantial evidence that the defendant was involved in the crime prior to the abduction of the victim, his presence in the vehicle while the victim was still alive, and his assistance in the concealment of the body was sufficient to support the jury's conclusion that he was criminally responsible for especially aggravated kidnapping. Even if, as he contends, the defendant was not

originally involved in the abduction, especially aggravated kidnapping is a continuing offense. State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999).

Especially aggravated robbery is robbery accomplished by the use of a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a). The federal guilty pleas, the use of the rifle, and the defendant's possession of the cash taken from the victim all indicate that the defendant provided substantial assistance in the crime. In summary, the evidence was sufficient in each of the three convictions.

II

The defendant next argues that evolving standards of fairness require the abandonment of the dual sovereignty doctrine. The state argues to the contrary.

Our federal constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime unless upon presentment or indictment by a grand jury . . . nor shall any person be subject to the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend V. Similarly, Article I, section 10 of the Tennessee Constitution provides that "no person shall, for the same offenses, be twice in jeopardy of life or limb." Successive prosecutions in state and federal courts which are predicated upon the same acts do not violate the constitutional guaranties against double jeopardy under the Fourteenth Amendment to the United States Constitution. Bartkus v. Illinois, 359 U.S. 121, 132 (1959); United States v. Wheeler, 435 U.S. 313, 316-17 (1978). Article I, section 10 of the Tennessee Constitution affords no greater protection. Lavon v. State, 586 S.W.2d 112 (Tenn. 1979). In Lavon, our supreme court upheld the dual sovereignty doctrine. See id. Despite an expression of "grave doubts as to the inherent fairness of any procedure that forces an individual to defend himself against multiple prosecutions for the same crime," our high court expressed "even graver doubts as to the propriety of . . . abandoning such a firmly established rule of law, absent compelling circumstances." Id. at 114. The majority, in this 3-2 decision, held that "the question of the propriety of successive state and federal prosecutions for the same act, being essentially one of policy, is 'committed to the intelligence and discretion' of the legislature and we leave it to their considered judgment." Id. at 115 (quoting Rush v. Great American Ins. Co., 213 Tenn. 506, 376 S.W.2d 454, 459 (1964)); see Annotation, Conviction or Acquittal in Federal Court as Bar to Prosecution in State Court for State Offense Based on Same Facts - Modern View 6 A.L.R. 4th 802 (1981).

In Lavon, a minority of our supreme court concluded that Article I, section 10 of the Tennessee Constitution would preclude a state prosecution for robbery when the defendant had already been convicted in the federal court of robbery of a federally insured bank. Writing for the minority, Justice Brock stated that "a substantial identity of offenses exist[s] when an act of Congress and a statute of the Tennessee legislature each proscribes essentially the same conduct, as in this case the robbery of a bank, and prescribes substantial punishment for the offender, as is also true in the instant case." Lavon, 586 S.W.2d at 115-16 (Brock, J., dissenting). According to the minority opinion, it was the majority position "that a second trial for the same act is somehow less offensive if one of the trials is conducted by the Federal Government and the other by the State." Id. at 116.

Since the ruling in <u>Lavon</u>, however, this court has consistently upheld the dual sovereignty doctrine. See <u>State v. Holmes</u>, 995 S.W.2d 135, 139 (Tenn. Crim. App. 1998); <u>State v. Wych</u>, 914 S.W.2d 558, 561 (Tenn. Crim. App. 1995); <u>State v. Chitwood</u>, 735 S.W.2d 471 472-73 (Tenn. Crim. App. 1987); <u>State v. Crabtree</u>, 655 S.W.2d 173, 177 (Tenn. Crim. App. 1983); <u>State v. Straw</u>, 626 S.W.2d 286, 287 (Tenn. Crim. App. 1981). The underlying theory is that the United States and the State of Tennessee are separate sovereigns, each with the right to prosecute for any violation of their respective laws. Most recently, in <u>State v. Robert Lewis Carpenter, Jr.</u>, No. W2000-02610-CCA-R3-CD (Tenn. Crim. App., at Jackson, Aug. 29, 2001), a separate panel of this court denied a challenge by the defendant's brother to the dual sovereignty doctrine. Following the rule declared in <u>Lavon</u>, the panel determined that any modification of the dual sovereignty doctrine was a matter of consideration for the Tennessee General Assembly. Our view is the same.

III

When a defendant is sentenced to imprisonment for life without the possibility of parole, this court "shall" review the appropriateness of the sentence. Tenn. Code Ann. § 39-13-207(g). Such a sentence is appropriate "if the state proved beyond a reasonable doubt at least one statutory aggravating circumstance contained in § 39-13-204(i) and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of . . . discretion." Tenn. Code Ann. § 39-13-207(g).

At the conclusion of the penalty phase in this case, the jury found that the state proved the following three aggravating circumstances beyond a reasonable doubt:

(5) that the murder was especially heinous, atrocious, or cruel in that it involved torture;
(6) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and
(7) that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, among other offenses, robbery and/or kidnapping.

Tenn. Code Ann. § 39-13-204(i)(5)-(7). If the state has met its burden to prove one aggravating circumstance beyond a reasonable doubt, and the sentence was not otherwise arbitrarily imposed, the sentence must be upheld. See Tenn. Code Ann. § 39-13-207(g).

Initially, the defendant does not challenge the sufficiency of the evidence as to any of the three aggravating circumstances. On appeal, this court is required to review the evidence in the light most favorable to the state. By the use of that guideline, it is our view that a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. See <u>State v. Suttles</u>, 30 S.W.3d 252, 262 (Tenn. 2000).

Here, Dr. Smith testified that torture involved dependency, degradation, and dread. He opined that the victim had suffered all of these as she traveled to her death. This court has held that

the "anticipation of physical harm to oneself is tortuous," sufficient to establish this aggravating circumstance. State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 886-87 (Tenn. 1998)); State v. Hodges 944 S.W.2d 346, 358 (Tenn. 1997)). The murder and the subsequent concealment of the body as well as the defendant's flight from authorities was sufficient to establish that the murder was committed to avoid arrest. Additionally, the defendant agreed during his guilty plea in federal court that the victim had been killed to prevent her from testifying against them. Because the defendant was involved in the robbery and kidnapping of the victim, the evidence was sufficient to establish that the killing occurred while the defendant had a substantial role in committing or fleeing after the commission of a robbery or kidnapping. Thus, the evidence was sufficient to support each of the three aggravating circumstances. Because the evidence was sufficient to support a finding of each aggravating circumstance beyond a reasonable doubt, and because there is no showing that the sentence was arbitrarily imposed, it is our view that the jury did not abuse its discretion.

Accordingly, the judgments are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE